Nos. 26-2085 (L), 26-2196

# United States Court of Appeals for the Fourth Circuit

NATIONAL ELECTRONIC ATTACHMENT, INC.,
D/B/A VYNE DENTAL
*Plaintiff-Appellant*
v.
HENRY SCHEIN ONE, LLC,
*Defendant-Appellee*

From the United States District Court for the District of Maryland
Case No. 1:25-cv-03246-MJM (Hon. Matthew J. Maddox)

## PLAINTIFF-APPELLANT'S OPENING BRIEF

K. Nichole Nesbitt
Derek M. Stikeleather
GOODELL DEVRIES LEECH & DANN, LLP
One South Street, 20th Floor
Baltimore, MD 21202
dstikeleather@gdldlaw.com
knn@gdldlaw.com

Vincent Levy
*Counsel of Record*
Jack L. Millman
Daniel Fahrenthold
Jessica Marder-Spiro
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Ave, 14th Floor
New York, New York 10017
vlevy@hsgllp.com

*Attorneys for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

I, the undersigned counsel of record for National Electronic Attachment, Inc., certify to the best of my knowledge and belief the following:

National Electronic Attachment, Inc. is incorporated under the laws of Delaware and is wholly owned by TJC LP, a privately held limited partnership.

There is no publicly held corporation or similarly situated master limited partnership, real estate investment trust, or other legal entity whose shares are publicly held or traded that is required to be disclosed under Local Rule 26.1(a)(2)(B) or (C).

*/s/ Vincent Levy*

## TABLE OF CONTENTS


INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 3

ISSUES PRESENTED ........ 4

STATEMENT OF THE CASE ........ 5

A. Factual Background ........ 5

B. Procedural Background ........ 11

1. HSOne Alleges a Violation of the CFAA Based on "Hacking" Software, Not Computers. ........ 11

2. The District Court's Injunction. ........ 15

SUMMARY OF THE ARGUMENT ........ 18

STANDARD OF REVIEW ........ 22

ARGUMENT ........ 23

I. There Was No Clear Showing That Vyne Violated the CFAA ... 23

A. The CFAA Does Not Address Software Distribution. ........ 24

B. The Vyne Trellis Software Did Not Violate the CFAA. ........ 32

1. There Was No "Access" To The HSOne Server. ........ 32

2. The Purported Access Caused No "Damage." ........ 42

C. The Criminal-Law Consequences Support Vyne. ........ 46

II. The Remaining Factors Did Not Support Relief. ........ 48

A. Irreparable Harm Was Not "More Likely Than Not." ........ 48

B. The Equities Strongly Favored Vyne. ........ 54

CONCLUSION ........ 57

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*2311 Racing LLC v. NASCAR*,
139 F.4th 404 (4th Cir. 2025) ........ 23, 48

*Abu v. Dickson*,
107 F.4th 508 (6th Cir. 2024) ........ 33

*Advanced Res. Int'l, Inc. v. Tri-Star Petroleum Co.*,
4 F.3d 327 (4th Cir. 1993) ........ 51

*Amazon.com Servs., LLC v. Perplexity AI, Inc.*,
184 F.4th 1083 (9th Cir. 2026) ........ *passim*

*Centro Tepeyac v. Montgomery Cnty.*,
722 F.3d 184 (4th Cir. 2013) ........ 23

*CFTC v. Kimberlynn Creek Ranch, Inc.*,
276 F.3d 187 (4th Cir. 2002) ........ 23

*Cisco Sys., Inc. v. Doe I*,
146 S. Ct. 1882 (2026) ........ 27

*Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*,
810 F.3d 1075 (7th Cir. 2016) ........ 44

*Freeman v. DirecTV, Inc.*,
457 F.3d 1001 (9th Cir. 2006) ........ 25

*hiQ Labs, Inc. v. LinkedIn Corp.*,
31 F.4th 1180 (9th Cir. 2022) ........ 33

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
4 F.3d 819 (9th Cir. 1993) ........ 57

*MicroStrategy Inc. v. Motorola, Inc.*,
245 F.3d 335 (4th Cir. 2001) ........ 56

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) .......... 50

*Omega World Travel, Inc. v. Trans World Airlines*,
111 F.3d 14 (4th Cir. 1997) .......... 49

*Paroline v. United States*,
572 U.S. 434 (2014) .......... 43

*Pierce v. N.C. State Bd. of Elections*,
97 F.4th 194 (4th Cir. 2024) .......... 22

*Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*,
131 F.4th 205 (4th Cir. 2025) .......... 22, 52, 54, 55

*Roe v. Dep't of Def.*,
947 F.3d 207 (4th Cir. 2020) .......... 22

*Salomon & Ludwin, LLC v. Winters*,
150 F.4th 268 (4th Cir. 2025) .......... 55

*Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*,
605 U.S. 280 (2025) .......... 26, 31

*United States v. Eddings*,
161 F.4th 199 (3d Cir. 2025) .......... 33

*United States v. Lanier*,
520 U.S. 259 (1997) .......... 46

*United States v. Valle*,
807 F.3d 508 (2d Cir. 2015) .......... 2

*Van Buren v. United States*,
593 U.S. 374 (2021) .......... *passim*

*WEC Carolina Energy Sols. LLC v. Miller*,
687 F.3d 199 (4th Cir. 2012) .......... 33, 42, 46

*West Va. Rivers Coal., Inc. v. Chemours Co. FC, LLC*,
178 F.4th 102 (4th Cir. 2026)....49, 50, 52, 53

**Statutes**

18 U.S.C. § 2 ....48

18 U.S.C. § 1030....*passim*

18 U.S.C. § 2702....25

18 U.S.C. § 2707....25

28 U.S.C. § 1292....4

28 U.S.C. § 1331....3

**Other Authorities**

*A Dictionary of Computing* (6th ed. 2008)....34

*Barnhart Dictionary of New English* (3d ed. 1990)....34

C. Sippl & R. Sippl, *Computer Dictionary and Handbook*
(3d ed. 1980)....34

Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes*,
78 N.Y.U. L. REV. 1596 (2003)....23

*Microsoft Computer Dictionary* (4th ed. 1999)....34

*Oxford English Dictionary* (2d ed. 1989)....34, 35, 36

*Random House Dictionary of the English Language* (2d ed. 1987)....34

**Rules**

Fed. R. Civ. P. 65(c)....17

# INTRODUCTION

Appellant Vyne Dental sells software known as "Vyne Trellis" that helps dental practices communicate with patients and get paid, such as by sending appointment reminders, issuing invoices, submitting claims to insurers, and tracking payments. Appellee HSOne sells software known as "Dentrix" to dental practices so they can store patients' health information; HSOne also sells software that competes directly with Vyne Trellis.

After HSOne tried to steal Vyne's customers and sell them its competing product by preventing Vyne Trellis from interoperating with Dentrix, Vyne sued HSOne for unfair competition and other torts. HSOne counterclaimed that certain Vyne Trellis functions that interoperate with Dentrix violate the Computer Fraud and Abuse Act ("CFAA"). In an unprecedented opinion, the court below agreed with HSOne and preliminarily enjoined Vyne from selling, distributing, or marketing software that writes data on dentists' computers.

The relevant portion of the CFAA, which is a criminal statute, does not address software design or distribution; instead, it prohibits hacking. It proscribes "intentionally access[ing] a protected computer without

authorization, and as a result of such conduct, caus[ing] damage and loss." 18 U.S.C. § 1030(a)(5)(C). This requires something akin to "breaking and entering." *United States v. Valle*, 807 F.3d 508, 525 (2d Cir. 2015).[1] Yet, in this case, dentists voluntarily license Vyne Trellis from Vyne and install it on their own computers to access data there.

Despite this, the court granted HSOne a preliminary injunction on the basis that Vyne likely "accessed" a protected computer "without authorization." The computer at issue was not the dentists' computers, but rather HSOne's separate cloud computer servers. To get there, the court relied on the following attenuated chain of logic: (1) Vyne sold Vyne Trellis to dental practices; (2) those practices installed and used Vyne Trellis locally; (3) some practices used Vyne Trellis software functions to write data on their Dentrix databases on their computers (*e.g.*, logging payments received via Vyne Trellis to their financial ledger); and (4) HSOne chose to have Dentrix "local installations sync with HSOne's servers." JA1759; JA77–JA82. On that basis, the court treated Vyne as having accessed HSOne's servers itself.

[1] Unless otherwise noted, all internal quotation marks, citations, and alterations have been omitted and emphases added.

The district court's order was error, and its novel interpretation of the CFAA cannot be squared with text or caselaw. Indeed, the parties identified no case where a court ever enjoined the selling of software under the CFAA, nor any case remotely supporting the decision below save one—a district-court decision that the Ninth Circuit reversed this summer. *Amazon.com Servs., LLC v. Perplexity AI, Inc.*, 184 F.4th 1083 (9th Cir. 2026). In reversing, the Ninth Circuit squarely held that a software publisher does not "access" computers under the CFAA even if its software does, because "[i]t is the user" of software "who 'accesses' [] computers, with the help of the [software]," not the publisher. *Id.* at 1091.

Affirming the injunction would expand the scope of civil and criminal liability under the CFAA well beyond what its text permits—and create a circuit split. And the district court committed further legal error, including in its irreparable-harm findings and its evaluation of the equities. This Court should set aside the injunction against Vyne.

## JURISDICTIONAL STATEMENT

The district court has jurisdiction under 28 U.S.C. § 1331. On July 31, 2026, the district court granted, in part, Defendant-Appellee's motion for a preliminary injunction. JA2. Plaintiff-Appellant timely appealed on

August 6, 2026. JA1730. This Court has jurisdiction under 28 U.S.C. § 1292(a).

## ISSUES PRESENTED

*First*, whether a person may violate Section 1030(a)(5)(C) of the CFAA, which proscribes "access" to a computer, based on designing, selling, and distributing software to third parties who use that software.

*Second*, whether software may be deemed to "access" a company's cloud server in violation of Section 1030(a)(5)(C) when customers use the software to edit data solely on their own local computers, on the basis that the company runs a background synchronization service that exchanges data between the cloud server and the customers' computers.

*Third*, whether there can be statutory "damage" that is "a result of" access to a cloud server through such a synchronization process, when none of the district court's findings of "damage" were caused by or otherwise relate to that synchronization process.

*Fourth*, whether a preliminary injunction may issue to guard against an uncertain risk of a security issue to third-party customers, when no such issue has arisen for five years, and when the injunction

would cause the enjoined party substantial erosion to its customer base and disserve the public interest, including by harming those customers.

## STATEMENT OF THE CASE

### A. Factual Background

**1.** Vyne designs, markets, and distributes a suite of software solutions to help dental practices run their businesses. JA3. Its primary product is "Vyne Trellis." JA74. Dentists use Vyne Trellis to verify patient eligibility for benefits in a health plan, submit medical claims to insurers, and receive payments. JA74. Vyne also offers premium tiers of Vyne Trellis that include: (1) a package that allows dentists to automatically record the receipt of payments from insurers or patients on dentists' financial ledger on their computers, and (2) a patient-engagement package, which allows dentists to automatically send patients appointment reminders, payment reminders, and patient forms, among other functions. *See* JA80; JA702–JA705, JA794–JA795 (Roberts).

HSOne designs, markets, and distributes software known as Dentrix to dental practices. The core of this product is essentially an electronic filing system; practices use this software to store and access patients' electronic health information and other practice information,

such as the practice's financial ledger, in an electronic database. JA3, JA81. In addition, HSOne also designs, markets, and distributes software modules to help dentists perform other tasks with their data, including the same sorts of payment and patient-engagement tools Vyne offers. JA3, JA81.

The Dentrix software at issue here operates on dentists' computers and uses data stored locally on databases housed on those same computers; the decision below referred to these local databases as the "Dentrix database" (though no single, centralized Dentrix database exists). JA81; *see also* JA2899 (McDaniel) (agreeing that "[t]he version of Dentrix that's at issue in this litigation stores patient data on a local computer of the dentist"). It was undisputed that the data stored in Dentrix databases is owned by dental practices and their patients, not HSOne. JA1003–JA1004 (Weatherly).

At the same time, like many other software publishers, HSOne performs updates to Dentrix software installed locally on dentists' computers through the internet. JA77. To do so, HSOne employs HSOne software stored on its own servers (the "HSOne Server"), and this HSOne software facilitates the updates that HSOne chooses to push to its

customers by communicating with local software installations of its customers. JA77. HSOne initiates and controls this "syncing" process. JA80. The HSOne Server does not store copies of customers' data. JA81; *see also* JA1499 (Burshteyn) (HSOne's counsel conceding HSOne Server does not maintain copies of data stored locally).

**2.** Given that dental practices store their practice and patient data electronically on their computers using software such as Dentrix, Vyne has incorporated various interoperability features in Vyne Trellis. These features allow practices to access their patient and practice data from software like Dentrix and use that data to perform payment and patient-engagement functions in Vyne Trellis. JA74, JA80.

To that end, Vyne Trellis has long had a printer driver that enables dental offices to "print" their data from Dentrix into an electronic document. This is akin to a "print to PDF" function in Microsoft Word, except that the electronic document "printed" in Dentrix (and containing patient or practice data) is transmitted automatically on the back end to Vyne Trellis so that dentists can perform functions in Vyne Trellis using that data. JA3–JA5, JA74. (HSOne also allows dentists to use print

drivers to transfer information from and within Dentrix. JA3–JA5, JA74, JA91 n.13.)

Since 2021, Vyne Trellis has had additional integration tools in a software package known as "VyneSync." As of the injunction hearing, roughly 20% of Vyne's customers who also used Dentrix (or 1,200 customers) licensed a Vyne Trellis package that uses VyneSync. JA806 (Roberts); JA924, JA958 (Nix). VyneSync uses decryption and Dentrix administrator-level credentials to create a direct connection via "Open Database Connectivity to connect to customers' Dentrix database and access the data therein." JA80–JA81. This database connection in turn permits those customers to have Vyne Trellis automatically "read data from the [Dentrix] database and write or alter data in the [Dentrix] database" stored on their own computers. JA80. As the court below found, Vyne has "authorization from its customers to access the Dentrix database stored on the customer[s'] computers." JA79.

To illustrate, VyneSync permits customers to pull information from their Dentrix database on their computer so that Vyne Trellis can generate billing statements to be sent to their patients. JA81. By way of another example, VyneSync's "read and write functionality" allows

customers "to reconcile payments with the ledger automatically once payments were received," a process that "cause[s] data to be entered into the Dentrix database for the purpose of routing the billing statements." JA81–JA82. In other words, a dental practice can set Vyne Trellis to update its own financial ledger (stored locally on its Dentrix database) upon the receipt of a payment that the practice obtains via Vyne Trellis.

In addition, until December 2, 2025, Vyne Trellis used VyneSync to permit dentists to use a Dentrix module called "QuickBill" to issue bills via Vyne Trellis instead of Dentrix. JA81. As the testimony cited by the district court explained, dental practices could ask Vyne Trellis to configure their local Dentrix software so that when the customer submitted a bill via this QuickBill module on Dentrix, the information would be routed to Vyne Trellis instead, and Vyne Trellis would receive the information to issue a bill as directed by the dental practice. JA81–JA82 (citing JA762–JA766 (Roberts); JA913–JA914 (Nix); JA1310–JA1312 (Clip)). After HSOne started to complain about certain unintended consequences, Vyne changed its software to use a print driver instead, and took active steps to have customers upgrade to the new

version. JA83; *see also* JA917–JA918, JA940, JA942–JA943 (Nix); JA1314–JA1315 (Clip).

**3.** For nearly 20 years, and until early 2025, dental practices that were mutual customers of Vyne and HSOne used both products without incident. JA153–JA155; *see also* JA75. But in early 2025, HSOne launched a campaign that led Vyne to sue HSOne and that the court below found likely violated unfair competition law.

First, in March 2025, HSOne informed dental practices that it would update Dentrix to break interoperability with Vyne Trellis, on the ostensible ground that Vyne's software posed security issues, while offering discounts for customers to switch from Vyne to competing Dentrix offerings. *See* JA5; JA73–JA77. Despite HSOne's claims to joint customers, "[t]here is no evidence that Vyne suffered or caused any data security breach during the relevant period." JA75.

In April 2025, HSOne issued updates to Dentrix that placed the Vyne Trellis print driver on a list of "hostile" drivers. JA5, JA80. This caused the Vyne Trellis driver to stop functioning. JA5, JA80. Vyne had to "remove its printer driver from HSOne's list of hostile printer drivers

in Dentrix so that the printer driver would continue to function on the parties' shared customers' computers." JA80.

HSOne continued to claim to dentists that the print driver was unsupported and unsafe (despite HSOne using the same technology in Dentrix) and continued to urge customers to switch software providers. JA74–JA75. Then, "[i]n September 2025, HSOne deployed a software update" to Dentrix that searched customers' computers for any Vyne software processes and "disabled any Vyne software running on their mutual customers' computers." JA75. HSOne distributed this virus to customers "while continuing to target the same customers with promotion of HSOne's competing product." JA75.

### B. Procedural Background

#### 1. HSOne Alleges a Violation of the CFAA Based on "Hacking" Software, Not Computers.

Given HSOne's escalating campaign, Vyne sued HSOne in September 2025 in the U.S. District Court for the District of Maryland and moved for a preliminary injunction, asserting, as relevant here, that HSOne committed the tort of unfair competition by seeking to mislead Vyne's customers about the functionality of Vyne's software, by falsely asserting to Vyne customers that Vyne's software was unsafe and caused

security breaches, and by disabling Vyne software and software functions with updates it distributed to its customers' Dentrix programs. *See* JA121–JA151; JA485–JA526.

HSOne counterclaimed and moved for a preliminary injunction, alleging, among other things, that Vyne violated the CFAA. JA277–JA358. HSOne's legal strategy mirrored the same commercial strategy which the district court later enjoined as tortious: HSOne claimed that Vyne's software was dangerously insecure despite Vyne never being responsible for a security breach, and it sought (via litigation, rather than technical means) to disable core Vyne Trellis functions to benefit its competing products.

From the beginning, HSOne's theory was that Vyne violated the CFAA by "hacking" into HSOne software on dentists' computers—not that Vyne violated the CFAA by hacking into HSOne's servers. JA279 (complaining of "Vyne's hacking of the Dentrix software instances that HSOne installs in its customers' infrastructure").

Opposing HSOne's preliminary injunction motion, Vyne explained that the CFAA does not protect software, and that the operation of Vyne Trellis on customer computers could not form the basis of a CFAA claim

because customers consent to the presence and deployment of Vyne's software on their systems; install the Vyne Trellis software on their computers; and license it for the purpose of performing the very tasks that HSOne complained about. Dist. Ct. Dkt. 52 at 7–8.

In reply, HSOne asserted for the first time that "part of the Dentrix software system includes a cloud infrastructure component on HSOne-hosted servers," which "sends and receives data to the customers' installation." Dist. Ct. Dkt. 62 at 4. The reply did not identify what data was being sent to or received from the HSOne Server. *See id.*

And even after making this argument, HSOne continued to focus almost exclusively on its software-hacking theory. Thus, on January 26, 2026, HSOne served a report by its cybersecurity expert, David Youssef, purporting to support HSOne's claims of "hacking," but which *did not mention* the HSOne Server or any purported access to it by Vyne, its software, or its customers. JA3040–JA3085. And, as HSOne's counsel continued to argue, the "point" of HSOne's CFAA claim "is that the *software* is HSOne's, it's deployed into the *customer's systems*," and HSOne can "sue based on the harm caused by" Vyne Trellis's interaction with that software. JA680 (Burshteyn).

In February 2026, the district court held a three-day evidentiary hearing on the parties' motions for preliminary injunctions that included testimony from fact and expert witnesses. JA71–JA72. HSOne's evidence aligned with its claim that it was illegal for Vyne Trellis to access HSOne's software on customer computers. Thus, HSOne's expert made clear his "understanding" that "the on-premise database" on customer computers was what "Vyne was gaining unauthorized access to," and any data transfer with the HSOne Server was caused only by the HSOne Server "sync[ing] to and writ[ing] back to Dentrix's Cloud database." JA2805 (Youssef).

The district court then received post-hearing briefs and heard oral argument, after which the court stated its intention to grant preliminary injunctive relief in favor of HSOne and asked for further briefing on "how the injunction should be crafted." JA16. The parties submitted those briefs, and the court then held an additional hearing, after which it entered a letter order "describing the preliminary injunctive relief it planned to grant . . . and setting a schedule for briefing on technical feasibility, compliance periods, and bond amounts." JA16.

### 2. The District Court's Injunction.

On July 31, 2026, the court issued a decision and order addressing the parties' motions to dismiss and for preliminary injunctive relief. The court found that "HSOne has made a clear showing it is likely to succeed on the merits of its CFAA counterclaim against Vyne and that it is likely to suffer irreparable harm without a preliminary injunction against Vyne writing to the Dentrix system." JA77. This decision was based on the following legal conclusions:

a. The HSOne Server is a "protected computer." JA77.

b. Vyne, "intentionally" and "without authorization," "accessed" the HSOne Server "when it caused its software to connect and integrate with the Dentrix databases installed on the computers of the parties' shared customers and those local installations synchronized with HSOne's cloud infrastructure." JA77–JA80.

c. Vyne's "access" consisted of VyneSync software operating "in the Dentrix database . . . [to] write or alter the data in the database" locally, JA80, but there was no finding that this altered data was shared back to the HSOne Server.

d. Vyne's "access caused damage" to HSOne by "disrupt[ing] referential integrity within the database, caus[ing] database performance issues, and interfer[ing] with HSOne's ability to disseminate upgrades to Dentrix software through its cloud infrastructure." JA83.

Based on these findings, the court "enjoined [Vyne] from marketing software capable of write access to Dentrix databases stored or hosted on HSOne's cloud system and Dentrix databases that sync to HSOne's cloud infrastructure," JA95, and gave Vyne 45 days to comply, JA92. Although the court described it as a "prohibitory injunction," the court thought the "mandatory injunction" standard was met too. JA90 n.12.

At the same time, the district court found that HSOne likely committed the tort of unfair competition, including because it "substantially interfered with Vyne's ability to compete on the merits of its products by blocking the parties' mutual customers' ability to use Vyne's software while, at the same time, promoting HSOne's own competing product." JA74. Among other things, "HSOne blocked the mutual customers' use of print drivers provided by Vyne," "knowing that this action would severely disrupt the customers' workflows." JA74.

"HSOne then targeted the same set of customers to promote HSOne's own competing . . . product," including through communications that "misrepresented the functionality of Vyne Trellis" and made claims of a "Vyne security breach" despite "no evidence that Vyne suffered or caused any data security breach during the relevant period." JA74–JA75. Thus, the district court enjoined HSOne, ordering that it shall not "disable any Vyne Dental software and/or software functions operating on dental practices' computers" and shall not "deny Vyne Dental software printer-driver access to Dentrix databases stored and operating on any dental practices' computers." JA96.

The court did not determine what security the parties needed to post, *contra* Fed. R. Civ. P. 65(c), and instead set a bond hearing for September 16, later rescheduled to September 24, JA1765.

Vyne timely appealed the injunction against it, JA1730, and sought a stay pending appeal, *see* JA1758. On September 8, after granting an administrative stay, the district court stayed the injunction until it determined a bond amount at a hearing on September 24, but otherwise denied Vyne's stay motion, despite acknowledging that (*Perplexity* aside) no "prior court decision . . . is on all-fours" and that "application of [the

CFAA] to Vyne's conduct might raise an admittedly difficult legal question." JA1762, JA1764.

On September 14, Vyne moved this Court for a stay pending appeal. Following the September 24 bond hearing, the district court required HSOne to post a bond of about $7.3 million and extended the preliminary-injunction stay until this Court decided Vyne's stay motion. JA1766.[2] This Court granted a stay pending appeal on October 7.

## <u>SUMMARY OF THE ARGUMENT</u>

**I.** The district court erred in concluding that Vyne likely violated Section 1030(a)(5)(C) of the CFAA.

**A.** Section 1030(a)(5)(C) of the CFAA imposes liability on "[w]hoever . . . intentionally accesses a protected computer without authorization," and the statute's private right of action allows civil suit against the "violator." Thus, the relevant CFAA provisions permit suit only against the person who engages in unauthorized "access." But Vyne designs, sells, and distributes software to help its customers access their own data on their own computers.

[2] HSOne "did not present any evidence or oral argument to support any request for a security on the preliminary injunction entered against it." JA1768.

Vyne cannot be liable under the CFAA for its customers using its software. To hold otherwise would expand the CFAA to encompass civil aiding-and-abetting liability despite the absence of any express statutory provision for it. And the district court's ruling cannot be squared with the Ninth Circuit's holding in *Perplexity*, which persuasively explained why the CFAA's text does not impose liability on a software company for helping customers access data on their own computers, even if (unlike here) the data on their computers comes from a third-party computer.

**B.1.** Even if Vyne could be responsible for its software's conduct, that software never "accessed" the HSOne Server, which is the only protected computer on which the injunction rests. As the Supreme Court and several courts of appeals have made clear, "access" under the CFAA refers to the act of entering a computer system, and it requires conduct akin to forced entry or breaking into a computer. The district court made no findings that fall within the meaning of that term.

Instead, the district court held that Vyne Trellis accessed the HSOne Server because HSOne operates and controls a background synchronization process that syncs data between the HSOne Server and Dentrix installations on local computers where Vyne Trellis operates.

That kind of syncing connection is ubiquitous in the computer industry, and the mere fact that Dentrix programs communicate with HSOne's Server to update Dentrix software is not enough to hold that Vyne "accessed" HSOne's Server in violation of federal criminal law.

**B.2.** The district court also made no findings to support the conclusion that the supposedly unlawful access to the HSOne Server caused any statutory damage. The CFAA requires a causal connection between the unauthorized access and the statutory damage. But here, the district court found "damage" only to customers' local computers, and it was supposedly caused by Vyne Trellis's interactions with customers' databases on their own computers, not the HSOne Server.

**C.** To the extent the Court has doubt, the rule of lenity counsels against adoption of the district court's novel view of the CFAA. Application of the rule of lenity is proper here, as "imposing liability . . . would require a novel interpretation far afield from the statute's purpose to prevent . . . computer hacking." *Perplexity*, 184 F.4th at 1092.

**II.** The remaining preliminary-injunction factors support reversal.

**A.** The district court's findings of irreparable harm were legally wrong and fail to meet this Court's exacting standard for a preliminary

injunction—particularly where, as here, the injunction was mandatory and would significantly disrupt the status quo.

The harms the district court identified flowed from Vyne Trellis's operation on local dentists' computers, not from any synchronization to HSOne's Server. Because the court never found that Vyne Trellis's activities on customers' local computers were themselves illegal, any resulting harm cannot support an injunction. And the district court failed to hold HSOne to its burden of showing harm that is actual and imminent rather than remote and speculative. Indeed, the district court *never found* that irreparable harm was more likely than not in the absence of an injunction, as it was required to do. Nor could it, as Vyne Trellis has functioned in essentially the same way since 2021, without any evidence that Vyne Trellis ever suffered or caused a security breach since then.

**B.** As to the equities and public interest, the district court effectively ignored the serious harm the injunction would cause to Vyne, including disrupting Vyne's relationship with roughly 20% of the parties' joint customers and altering the status quo by requiring Vyne to cease selling a software product it has sold for years. The district court wrongly held that these concrete harms would be outweighed by a speculative and

hypothetical security risk to HSOne. And it failed to consider that the injunction locks customers into using HSOne's competing product, depriving them of their chosen product, and rewarding HSOne's year-long anticompetitive campaign.

## STANDARD OF REVIEW

"A preliminary injunction is 'an extraordinary remedy' that 'may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024) (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)). The requesting party must show that "(1) [it is] likely to succeed on the merits; (2) [it] will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in [its] favor; and (4) the injunction is in the public interest." *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 223 (4th Cir. 2025). To establish the first factor, parties "must make a clear showing that they are likely to succeed at trial." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020).

This Court reviews the entry of a preliminary injunction "for abuse of discretion," but "appl[ies] an exacting standard that demands a clear showing that the necessary criteria have been met." *2311 Racing LLC v.*

*NASCAR*, 139 F.4th 404, 408 (4th Cir. 2025). A district court abuses its discretion if "it applie[s] an incorrect preliminary injunction standard, rest[s] its decision on a clearly erroneous finding of a material fact, or misapprehend[s] the law with respect to underlying issues." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013). Questions of statutory interpretation are legal questions that are reviewed *de novo* within this framework. *See CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 191 (4th Cir. 2002).

## ARGUMENT

### I. There Was No Clear Showing That Vyne Violated the CFAA.

Enacted in 1986, the CFAA protects computers against hacking by specifying "seven distinct crimes, listed in § 1030(a)(1) through (a)(7)." Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes*, 78 N.Y.U. L. REV. 1596, 1616 (2003); *see* 18 U.S.C. § 1030. The statute imposes criminal liability, and permits "any person who suffers damage or loss by reason of a violation" to "maintain a civil action against the violator." 18 U.S.C. § 1030(g).

Some of the CFAA crimes depend on whether persons "exceed[] authorized access," but "almost all" of them "are triggered by access without authorization to computers." Kerr, *supra*, at 1616; 18 U.S.C.

§ 1030(a)(1). That includes the sole provision cited below: the court found a likely violation of Section 1030(a)(5)(C), which proscribes "intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage and loss." 18 U.S.C. § 1030(a)(5)(C). Section 1030(a)(5)(C) protects computers, not software. *See* 18 U.S.C. § 1030(e)(2) ("[T]he term 'protected computer' means a computer . . . ."). And when proscribing "access" "without authorization," the CFAA "protects computers themselves by targeting so-called outside hackers—those who 'acces[s] a computer without any permission at all.'" *Van Buren v. United States*, 593 U.S. 374, 389 (2021).

Vyne did not violate Section 1030(a)(5)(C).[3]

### A. The CFAA Does Not Address Software Distribution.

To begin, the district court erred because Vyne's customers, not Vyne, are the ones who could "access" computers here. What Vyne does is design, market, and distribute software to *dental practices*, so *they* can access their own data on their computers and then perform payment and

[3] Vyne disputes many of the facts found by the district court, including regarding the methods of access and claims of harm to HSOne. Vyne accepts these findings as described *infra* solely for purposes of the appeal, given the serious legal errors in the district court's analysis.

patient-engagement tasks. Before the decision below, no court had ever found that the CFAA imposes primary criminal and civil liability on a software publisher when its customers use software designed and sold by that publisher to help customers access their data—except in *Perplexity*, which the Ninth Circuit reversed. This Court should also reverse.

**a.** Start with the substantive offense. The relevant CFAA provision imposes criminal liability on "*[w]hoever . . . intentionally accesses* a protected computer without authorization." 18 U.S.C. § 1030(a)(5)(C). The word "[w]hoever" here means "the person who" does the act. *Whoever*, Cambridge English Dictionary. The act in question is "access[ing]" a computer, not helping another do so, whether by designing, selling, or distributing software useful to that purpose. And the CFAA's private right of action permits civil litigation "against the violator," 18 U.S.C. § 1030(g), *i.e.*, the person who violates the statute in the way proscribed—here, by "accessing." *Cf. Freeman v. DirecTV, Inc.*, 457 F.3d 1001, 1006 (9th Cir. 2006) (interpreting similar text in 18 U.S.C. §§ 2702, 2707).

The plain text thus confirms that the relevant CFAA provisions permit suit against the person who engages in unauthorized "access," and only that person. But Vyne is not that person. HSOne's complaint is that

Vyne designs, sells, and distributes to joint customers a software program that helps those customers manage their patient data, and the district court's finding was that the *operation of this software* resulted in allegedly unauthorized "access." JA78. That is why the district court's injunction does not prohibit Vyne from accessing any computer at all—it enjoins Vyne from "market[ing], sell[ing], or distribut[ing] software capable of write access to Dentrix databases." JA95.

Further confirming the point, subjecting Vyne to liability for its software's conduct amounts to improperly imposing secondary liability upon Vyne. Imposing liability for designing and then selling software to a customer to help him or her "access" data or computers while using the software is just that: aiding-and-abetting liability. *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 291 (2025) ("Federal aiding-and-abetting law 'reflects a centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out' if he deliberately 'helps another to complete its commission.'"). And as the Supreme Court has instructed many times, most recently just this year, "no [civil] aiding-and-abetting liability exists" when "Congress has not expressly provided for it." *See Cisco Sys.*,

*Inc. v. Doe I*, 146 S. Ct. 1882, 1893 (2026) (even statute broadly covering all persons who "subject[]" others to prohibited conduct did not make liable "those who are one (or more) steps from" the commission of conduct). But the CFAA does not expressly provide for secondary civil liability. It covers accessing computers, not helping another to do so.

**b.** The textual analysis limiting the CFAA's provisions to persons who themselves commit unauthorized "access," rather than publishers who design and distribute software to help customers access data on their computers, aligns with the Ninth Circuit's decision in *Perplexity*. Consistent with the CFAA's text, *Perplexity* held that the CFAA covers only persons who "access" computers, and that only the user of software, not the software publisher or its software, can engage in "access." 184 F.4th at 1091.

Consider the facts of *Perplexity*. Perplexity designs, markets, and distributes an AI "Assistant" that navigates Amazon.com on behalf of its customers. *Id.* at 1087–88. The software Assistant "operates like Google Chrome, running locally on a user's machine." *Id.* at 1087. When Perplexity's customers "direct[] the Assistant to locate an item on Amazon.com, the Assistant takes screenshots of the browser view, sends

those screenshots from the user's computer to Perplexity's servers, and receives instructions from Perplexity's servers on how to navigate Amazon.com." *Id.* Doing so involves "access[ing] with the Amazon user's permission but without authorization by Amazon, the user's password-protected account, thereby obtaining information as to the user's private Amazon account information." *Id.* at 1089.

Amazon sought a preliminary injunction against Perplexity because Perplexity was bypassing a mechanism Amazon was using to block Amazon's customers from working with Perplexity: "a user-agent string" that "would allow Amazon to block the Assistant's access to the Amazon store." *Id.* at 1088. The district court entered a preliminary injunction against Perplexity, holding that the operation of Perplexity's software likely violated Section 1030(a)(2)(C) (which, like Section 1030(a)(5)(C), bars "intentionally access[ing] a computer without authorization"). *Id.*

Perplexity appealed, and the Ninth Circuit set the injunction aside. That court reasoned that Perplexity did not itself "access" Amazon's servers when its customers used Perplexity's Assistant to access data on Amazon's servers—even though Perplexity "may communicate

instructions to the Assistant" from its own servers to direct the Assistant, *id.* at 1091, and even though "Amazon data was first transmitted to the user's computer and then to Perplexity's servers," *id.* at 1089. Rather, "[i]t is the user who 'accesses' Amazon's computers, with the help of the Assistant to carry out specific acts on Amazon.com." *Id.* at 1091. And it was not enough that Perplexity was "help[ing]" customers to engage in "access." *Id.* This was because "the CFAA contemplates access by a person," and a software program "is a tool, not a person for statutory purposes." *Id.*

So too here. Indeed, the factual support for holding that Vyne "accessed" the HSOne Server is far more attenuated than the factual support in *Perplexity* for finding access to Amazon's servers. Unlike in *Perplexity*, where there were express findings that Perplexity directed the Assistant to perform the functions that its customers wanted to perform from Perplexity's own servers, here there was no finding that Vyne (the company) was doing anything on an ongoing basis to direct or communicate with Vyne Trellis while dentists used the software, let alone that Vyne instructed Vyne Trellis to access the HSOne Server. Indeed, here it is HSOne—not Vyne or Vyne's customers—that directs

communications between customers' systems and the HSOne Server, which is the sole computer purportedly "accessed" without authorization. And while Perplexity obtained "Amazon data" via the software, *id.* at 1089, there was no finding here that Vyne ever received any HSOne data.

**c.** The district court was thus wrong to distinguish *Perplexity* on the basis that only "the browser user [there] direct[ed] the AI Assistant." JA1761. That is also true here, and the very page of the Ninth Circuit's opinion that the district court cited shows that the Perplexity Assistant "relie[d] on direction from the user *and instructions from Perplexity's servers*." *Perplexity*, 184 F.4th at 1087; *see also id.* at 1091 (holding that "communicat[ing] instructions to the Assistant" to help users obtain data from Amazon's servers is not "access" "to Amazon's servers"). The Ninth Circuit's reasoning makes sense: designing software to perform functions on behalf of customers is not "access," and neither is designing software to help the customer use and manage their data.

In its decision denying Vyne's motion for a stay, the district court stated that it "did not find that Vyne's selling of software constitutes 'access' within the meaning of the CFAA." JA1760. But it identified no finding that Vyne (the company) "accessed" any computer or data (and

Vyne did not). Instead, it pointed to Vyne's "intentional deployment of software functions" to customers. JA1761. But Vyne's customers, not Vyne, are the ones who "install the software" and use its data-writing functions. JA1761. And asserting that Vyne "deploy[s] software functions" is just another way of saying that Vyne designs, sells, and distributes software to customers for their own use—like in *Perplexity*. JA1761.

Further underscoring the point that Vyne was helping its customers by selling software rather than engaging in access itself, the district court's stay decision added that the software Vyne sold was supposedly problematic because it "*enable[d]*" Vyne's customer to obtain "a level of access" to his or her Dentrix database "beyond what the customer is capable of through use of her own credentials." JA1761. But just as providing software to "*help*" a customer gain access to Amazon's website is insufficient, *Perplexity*, 184 F.4th at 1091, so too is providing software to "*enable*" customers to conduct allegedly unlawful access, even access "beyond what" they could obtain without Vyne Trellis, JA1761; *cf.* *Smith & Wesson*, 605 U.S. at 291 ("aiding-and-abetting law" targets those who "deliberately help[] another to complete" an offense).

### B. The Vyne Trellis Software Did Not Violate the CFAA.

The district court's merits ruling should be set aside even if this Court parts ways with *Perplexity* and attributes to Vyne all of the acts performed by Vyne's customers using Vyne Trellis. That is because the Vyne Trellis software that Vyne designed and distributed to customers did not "access" the "protected computers" that formed the basis of the district court's injunction, namely, the HSOne Server. Nor did it cause HSOne "damage and loss" as required to establish a violation.

#### 1. There Was No "Access" To The HSOne Server.

Although Vyne Trellis is installed on dentists' computers and although it (lawfully) accessed data there, the district court found a likely CFAA violation based on Vyne Trellis supposedly accessing a separate computer: a "cloud-based software system" that HSOne controls. JA77. The court's reasoning was that Vyne "caused its software to connect and integrate with the Dentrix databases installed on the computers of the parties' shared customers and those local installations synchronized with HSOne's cloud infrastructure." JA78–JA79. But this conduct by Vyne's software does not constitute "access" to the HSOne Server, whether by Vyne or those who use its software.

**a.** The CFAA does not define the term "access," but the Supreme Court adopted a precise definition in *Van Buren*. It explained that the term "access" has "long carr[ied] a well established meaning in the computational sense." 593 U.S. at 388. Based on that meaning, the Court instructed that "access" here "references the act of entering a computer system itself or a particular part of a computer system, such as files, folders, or databases." *Id.* at 388 & n.6 (citing relevant definitions of "access," including "to gain entry to memory in order to read or write data" and "to gain entry to data, a computer system, etc.").

Since *Van Buren*, the courts of appeals have likened unauthorized "access" under the CFAA to "forced entry" into a protected computer. *E.g.*, *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1196 (9th Cir. 2022). As the Ninth Circuit explained in *hiQ*, "[w]e . . . look to whether the conduct at issue is analogous to 'breaking and entering.'" *Id.* at 1197; *see also United States v. Eddings*, 161 F.4th 199, 205 (3d Cir. 2025) (adopting *Van Buren*'s definition of "access"); *Abu v. Dickson*, 107 F.4th 508, 514 (6th Cir. 2024) (same); *see also WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199, 204 (4th Cir. 2012) (under the CFAA, "access means 'to obtain, acquire,' or 'to gain admission to'").

**b.** The facts the district court found do not show that Vyne (or Vyne Trellis) "accessed" the HSOne Server, let alone in a fashion remotely resembling "breaking and entering" or "forced entry." Looking at the dictionary definitions cited in *Van Buren* confirms the point. *See* 593 U.S. at 388 n.6. There was no finding that Vyne or Vyne Trellis "gain[ed] access to data, etc., held in" the HSOne Server. 1 *Oxford English Dictionary* 72 (2d ed. 1989). Nor that Vyne or Vyne Trellis "locate[d] (data) for transfer from" the HSOne Server. *Random House Dictionary of the English Language* 11 (2d ed. 1987). Or that they "obtain[ed] data from or plac[ed] data in storage" on the HSOne Server. C. Sippl & R. Sippl, *Computer Dictionary and Handbook* 2 (3d ed. 1980). There was also no finding that Vyne or Vyne Trellis "retrieve[d] (data) from" the HSOne Server. *Barnhart Dictionary of New English* 2 (3d ed. 1990). Or that they "gain[ed] entry to memory [on HSOne's computers] in order to read or write data." *Microsoft Computer Dictionary* 12 (4th ed. 1999); *see also A Dictionary of Computing* 5 (6th ed. 2008) (defining the word "access" to mean "[t]o gain entry to data, a computer system, etc.").

Instead, the district court expressly found that Vyne Trellis accessed (and accessed data on) *customers' computers*. Thus, it found that

customers intentionally installed Vyne Trellis on their local computers, and that those customers who had premium Vyne Trellis software could use it to read and write data located on their computers. As it explained, "VyneSync uses Open Database Connectivity to *connect to customers' Dentrix database* and *access the data therein*" and "[t]his software has read and write functionality in the Dentrix database, allowing it to read data from the database and write or alter data in the database." JA80. The customers' computers are where Vyne Trellis and VyneSync "gain[ed] access to data." *Oxford English Dictionary*, *supra*, at 72. So this is a finding of access *to dentists' computers*, not to the HSOne Server.

In seeking to bridge the gap between the local "access" that it found and the HSOne Server, the court pointed to the fact that HSOne has an HSOne-controlled connection that "synchronized" Dentrix software on dentists' computers with software on the HSOne Server. JA77–JA78. This internet connection shows that HSOne accessed its customers' computers (given that HSOne controls the connection and transfers data through it), but it certainly does not mean that Vyne Trellis or VyneSync did so. Vyne and Vyne Trellis never "gain[ed] access to data" on the HSOne Server through this HSOne-controlled connection. *Oxford*

*English Dictionary*, *supra*, at 72. So it remains the case that Vyne Trellis accessed customers' computers, not the HSOne Server. That is just as HSOne's expert put it: he testified that "the on-premise database is the one that Vyne was gaining unauthorized access to," adding that the local databases separately "sync to and write back to Dentrix's Cloud database." JA2805 (Youssef).

In that regard, it is also worth stressing that the sort of "synchronization" process that the court found to exist here is no different from what Microsoft does for Word,[4] or Google for Chrome,[5] or Adobe for Acrobat[6]—or Zoom,[7] Slack,[8] and Dropbox[9] for their namesake products.

---

[4] *E.g.*, Microsoft, "When do I get the newest features for Microsoft 365" (last accessed Oct. 13, 2026), *available at* https://perma.cc/7FR7-H3WX.

[5] Google, "How to update your Chrome Browser" (last accessed Oct. 13, 2026), *available at* https://perma.cc/BWU7-FA9U ("Chrome checks for new updates regularly, and when an update is available, Chrome applies it automatically when you close and reopen the browser.").

[6] Adobe, "Update Acrobat automatically" (Sept. 23, 2025), *available at* https://perma.cc/ADP3-Q2KH ("Acrobat will now check for and install important updates automatically . . . .").

[7] Zoom, "Automatic update release frequencies" (Dec. 4, 2024), *available at* https://perma.cc/AZ27-LFAR.

[8] Slack, "Manage desktop app configurations" (last accessed Oct. 13, 2026), *available at* https://perma.cc/8JBV-5CRC.

[9] Dropbox, "How to update to the latest version of Dropbox on your computer" (Sept. 17, 2026), *available at* https://perma.cc/5K4J-JT9S

*Compare* JA562 (cited at JA77–JA78) ("This cloud infrastructure component is how HSOne upgrades the Dentrix software installed on computer environments. It sends software security upgrades and other software and data to the customer environment for updating the Dentrix software.").

These sorts of connections are a ubiquitous means for software publishers to push updates to their customers through the internet, with the client's consent. And they cannot show that, when a consumer operates software on his or her computer, the customer is accessing not just the computer where the software is installed and operates, but also the servers of companies who choose to send software upgrades through the internet from their cloud servers. The district court thus had it completely backwards.

**c.** Although the *Perplexity* decision focused primarily on the distinction between Perplexity and its software (a distinction that fully applies here), and declined to impose liability for selling software, the

("Like many programs and applications, Dropbox may automatically update to the latest version.").

court's reasoning also confirms that Vyne Trellis did not "access" the HSOne Server. The Ninth Circuit's reasoning is again persuasive.

On appeal in that case, Perplexity argued to the Ninth Circuit that it "never 'gained entry' to an Amazon computer because no Perplexity computer ever accessed Amazon's servers" as "any Amazon data was first transmitted to the user's computer and then to Perplexity's servers." *Perplexity*, 184 F.4th at 1089. The Ninth Circuit agreed. Because the data must travel between the customer's computer and Amazon's servers for Perplexity's Assistant to work, there was no "access," even though the Assistant "cannot operate wholly independently" and "relies on direction from the user and instructions from Perplexity's servers." *Id.* at 1087. If there was no "access" to Amazon's servers in *Perplexity*, then there was also no access to the HSOne Server here, given that, here as well, all reading and writing of data occurred locally—not on the HSOne Server.

At the risk of repetition, the basis to find "access" to the HSOne Server here is more attenuated than the basis to find "access" to Amazon's servers in *Perplexity*. *First*, as noted and unlike here, the data that Perplexity's Assistant was accessing locally had to be retrieved from Amazon's servers; as the Ninth Circuit put it, the Assistant was

"access[ing] with the Amazon user's permission but without authorization by Amazon, the user's password-protected account [on Amazon], thereby obtaining information as to the user's private Amazon account information" stored on Amazon's servers. 184 F.4th at 1089; *id.* at 1091 (Assistant "requests the contents of the page from Amazon's server and displays the page to the user"). In this case, by contrast, the district court found that the data was always on the customers' computers, given that the "Dentrix database [is] stored on customers' local installations." JA81.[10] There was no finding that Vyne Trellis read data stored on the HSOne Server, or what data (if any) written by Vyne Trellis locally made its way back to the HSOne Server.

*Second*, Perplexity accessed data from Amazon's servers in ways not found below. Thus, the Perplexity Assistant "sen[t] . . . screenshots from the user's computer [reflecting data pulled from Amazon.com] to Perplexity's servers, and receive[d] instructions from Perplexity's servers on how to navigate Amazon.com." *Perplexity*, 184 F.4th at 1087. There is

[10] The district court's limited findings were consistent with the hearing record, as HSOne's counsel conceded the HSOne Server does not maintain copies of data stored locally. JA1499 (Burshteyn); *see also* JA3312 ("The Dentrix software at issue runs on premise. The database is not in the cloud.").

nothing like that here—no finding that Vyne (the company) ever received any data from the Dentrix databases, let alone from the HSOne Server.

*Third*, the limited affirmative findings that the district court made about the nature of the "synchronization" process between the HSOne Server and the computers of its customers further underscore the lack of access to the HSOne Server by Vyne or Vyne Trellis. The court below found that *HSOne*, not its customers (much less Vyne) controlled communications between local Dentrix installations and the HSOne Server. JA77–JA78 (referring to "Dentrix cloud system controlled by HSOne" and stating that "the Dentrix cloud system is the electronic means by which *HSOne* updates and upgrades Dentrix software stored on its customers' computers and customers send data to servers HSOne controls").[11] That Vyne's software operates on computers running a separate synchronization process that its competitor controls does not

[11] These findings are again consistent with the hearing record. HSOne's counsel was unequivocal that HSOne initiates and controls these communications: "*we're* pulling up telemetry data, *we're* pulling up logs and *we're* sending down updates, *we're* sending down new versions." JA1499 (Burshteyn); *accord* JA562–JA563 (cited at JA77–JA78) (HSOne's Chief Information Security Officer asserting that HSOne's Dentrix programs control the transmission of data between local installations and the HSOne Server).

mean that Vyne has "intentionally access[ed]" that competitor's remote servers. 18 U.S.C. § 1030(a)(5)(C).

**d.** The district court sought to justify its holding that Vyne supposedly "accessed" the HSOne Server on the basis that VyneSync has code that "decrypts, extracts, and uses secret administrator-level credentials to gain a greater degree of access to the Dentrix system than what customers are permitted or equipped to achieve through their own [Dentrix] credentials." JA81; *see also* JA1760 (similar). That is not "access" to the HSOne Server by Vyne Trellis "without authorization."

To begin, the greater-degree-of-access finding is erroneous because the district court premised liability on a statutory provision that requires access "without authorization." Again, this refers to "outside hackers" who "access a computer without any permission at all," as distinguished from the proscriptions that cover conduct "exceeding authorized access." *Van Buren*, 593 U.S. at 389–90; *accord* JA78. So, whether Vyne Trellis granted customers a "greater degree of access" than they otherwise would have to software on their own computers, JA81, is beside the point. Customers are authorized to access both their own computers *and* the HSOne Server. JA78. Gaining "a greater degree of access" to either does

not constitute accessing a computer "without any permission at all." *See Van Buren*, 593 U.S. at 389–90; *see also WEC*, 687 F.3d at 204 (stating access cannot be "without authorization" when the computer owner "sanctions [defendant's] admission to that computer").

And each time the district court referenced Vyne Trellis's uses of these "administrator-level credentials," the district court made clear that all the action occurred on customers' computers at customers' request. *See* JA81–JA82. But again, the district court did not find unauthorized access by Vyne to those computers—nor could it have given that, through Vyne's terms of service, Vyne's customers "grant[] Vyne access" to "data stored on platforms and systems provided by a third party but controlled by a customer"—*i.e.*, their local Dentrix databases on their own computers. JA79 (acknowledging "Vyne's authorization from its customers to access the Dentrix database stored on the customer[s'] computers").

### 2. The Purported Access Caused No "Damage."

To establish a violation of Section 1030(a)(5)(C), HSOne must show "damage *and* loss" that is "a result of" the offending "access," 18 U.S.C. § 1030(a)(5)(C)—*i.e.*, there must be a causal connection between the

unlawful access and the resulting "damage and loss."[12] As the Supreme Court explained in *Van Buren*, "[t]he statutory definitions of 'damage' and 'loss'" in the CFAA "focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data." 593 U.S. at 391–92. The CFAA thus defines "damage" to mean "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).[13]

The district court's "damages" findings here lacked the requisite causal connection. None of the "damage" that the district court found concerned "data, a program, a system, or information" on HSOne's Server, and none of the impairment that supposedly occurred on customer computers was in any way caused by the synchronization which the district court held constituted "access" to that Server. Said differently, the asserted damage would be precisely the same if there

---

[12] *Paroline v. United States*, 572 U.S. 434, 445 (2014) (explaining that "[t]he words 'as a result of' plainly suggest causation," and holding that they required proximate causation).

[13] "Loss" is defined to "mean[] any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11).

were no synchronization at all—indeed, the district court never mentions the HSOne Server or synchronization in its discussion of statutory damage and loss. JA82–JA83; *see Fidlar Techs. v. LPS Real Estate Data Sols., Inc.*, 810 F.3d 1075, 1084 (7th Cir. 2016) (rejecting claim where the purported access did not "alter any of the content on the servers" supposedly accessed).

Instead, the court found a likely impairment to "the integrity and availability of data" because, for example, "Vyne's practice of writing back to the ledger *in the Dentrix database*" supposedly "created race conditions and errors in balances recorded in the ledger." JA82. This was not "damage" to or on HSOne's Server (the relevant computer) because the write-back occurred on dentists' computers. *See* JA80. There was no finding that the purported impairment flowed from any supposed access to any HSOne computer (or syncing). *Accord* JA1216–JA1217 (Rencher) (cited at JA82, stating that VyneSync "screws up the balances in the patient files" on dentists' computers).

The same is true of the district court's finding that VyneSync's "writing back to the Dentrix database" had "interfered with HSOne's ability to disseminate upgrades to Dentrix software through its cloud

infrastructure." JA83. Again, all the supposed "damage" occurred on the computers of dental practices, as this is where the software was installed, and the reason it could supposedly no longer be upgraded or updated (in an unidentified number of cases) is because data was in the process of being written on customers' computers. The evidence cited by the district court is in accord. For instance, HSOne's CEO testified that Vyne "caused our upgrades to stumble and break because they're holding our database open." JA1005–JA1006 (Weatherly) (cited at JA83). This is referencing access on dentists' computers that supposedly caused harm to the databases on *those computers*, not the HSOne Server.[14]

The remaining theories of "damage" are also inapposite. The court referred to Vyne Trellis "overwrit[ing] certain data in the Dentrix database," which was said to have "caused some of HSOne's customers' QuickBill accounts to stop working," JA82–JA83. And it stated that VyneSync's "writing back to the Dentrix database" had "disrupted

[14] *See also* JA1234 (Rencher) (cited at JA83) (HSOne's CTO testified that Vyne "grabbing the database connection and holding onto it . . . impacts our ability to install new versions and upgrade Dentrix"). The fact that the only harm with any possible connection to the HSOne Server relates to the distribution of updates to local Dentrix installations only underlines that the synchronization system at issue in this case was a simple and common software updating service. *See supra* at 36–37.

referential integrity within the database [and] caused database performance issues." JA82–JA83. These findings facially identify the cause of the harm to be VyneSync "writing back to the Dentrix database," JA82–JA83—*i.e.*, access to the computers of dental practices and not the HSOne Server. And all of this supposed "damage" occurred on the computers of dental practices; this is where the databases are located. At most, the Dentrix software on dentist computers was impaired, not the HSOne Server.

### C. The Criminal-Law Consequences Support Vyne.

The canon of lenity settles, in Vyne's favor, any lingering question about applying the CFAA to the conduct on which the district court grounded its injunction against Vyne. This Court has applied the rule of lenity when interpreting the CFAA in civil cases. *WEC*, 687 F.3d at 204; *see also Perplexity*, 184 F.4th at 1092. This canon requires courts to "resolv[e] ambiguity" in a statute "to apply it only to conduct clearly covered." *United States v. Lanier*, 520 U.S. 259, 266 (1997).

To borrow from *Perplexity*, "[e]ven accepting [HSOne's] approach as reasonable, imposing liability here would require a novel interpretation far afield from the statute's purpose to prevent intentional intrusion onto

someone else's computer—specifically, computer hacking." 184 F.4th at 1092. HSOne's argument (adopted by the district court) is indeed "far afield" from the statute's purpose: HSOne interprets the CFAA as policing the interoperability of different software packages operating on customers' computers. The CFAA's application to the conduct here would chill competition by threatening not just civil but also criminal liability anytime software on customers' computers connects to servers via the internet. Congress did not provide in the CFAA a mechanism for software publishers to guard software sold to consumers, whether from "reverse engineering," alleged misuse by former insiders, or interoperability functions they object to for technical or financial reasons. JA80–JA81.

And the implications of the district court's CFAA ruling are profound: An incredible number of computers run software programs that, like HSOne's, synchronize with local installations to perform updates. *See supra* at 36–37. Similarly ubiquitous are software programs that store information to a cloud, including Microsoft's OneDrive function or storage systems like Google Drive. Per the ruling below, these sorts of connections mean that, if the software publisher objects, editing files or data locally can become criminal "access" to those servers connected via

the internet. This is not the sort of "access" the CFAA proscribes. *Van Buren*, 593 U.S. at 388, 393 (rejecting CFAA interpretation that "would attach criminal penalties to a breathtaking amount of commonplace computer activity"); *Perplexity*, 184 F.4th at 1091–92.

Consider also the implications for ordinary consumers who use products like Vyne Trellis over the objection of a competitor like HSOne. "[HSOne's] approach, if accepted, could expose [those] users themselves to criminal liability (under a conspiracy or aiding-and-abetting theory) for facilitating [Vyne's] purported unauthorized access to [HSOne's] servers." *Perplexity*, 184 F.4th at 1092. Indeed, although the CFAA does not impose secondary *civil* liability, federal *criminal* laws do. 18 U.S.C. § 2. And HSOne took the position with its customers that Vyne was "an unauthorized third-party." JA5, JA10. Is it HSOne's position that its own customers violated federal criminal law? If not, how so?

## II. The Remaining Factors Did Not Support Relief.

### A. Irreparable Harm Was Not "More Likely Than Not."

The court's irreparable-harm findings were legally erroneous, and cannot survive the "exacting standard" that this Court applies. *2311 Racing*, 139 F.4th at 408. The district court relied on a "risk" of harm traceable to legal conduct and suffered by third parties, when this Court's

cases require harm to the moving party that is "more likely than not." *West Va. Rivers Coal., Inc. v. Chemours Co. FC, LLC*, 178 F.4th 102, 114 (4th Cir. 2026).

*First*, none of the harms (and risks) identified by the district court in its discussion can support the injunction for the same reason that there was no causal connection shown between the access and the statutory damage: the purported harms the district court found are due to access to customers' computers, which is *legal* conduct. As is settled, "[t]he purpose of interim equitable relief is to protect the movant, during the pendency of the action, from being harmed or further harmed . . . *through the illegality alleged*." *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997).

Here, the court cited the risk of a "major data security breach," and resulting "reputational harm and damage to [HSOne's] goodwill," and found it was all due to "Vyne's unsecure and uncoordinated integration with the Dentrix database." JA85. Nothing connects this supposedly irreparable harm to any "access" by Vyne Trellis to the HSOne Server—again, synchronization goes unmentioned. The "sensitive information" that was supposedly "placed at risk" is stored on local computers, and the

"integration with the Dentrix database" took place there too. JA85; *see also* JA1763. But because accessing dentists' computers was not unauthorized, it was not illegal—and an injunction cannot issue to prevent assertedly irreparable harm or risk caused by legal conduct.

*Second*, the district court improperly allowed HSOne to rely on harm to third parties rather than itself. As is settled, "[p]laintiffs seeking injunctive relief must show that *they themselves* are likely to suffer irreparable harm absent an injunction"—third-party injuries are not enough. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018); *Rivers Coal.*, 178 F.4th at 114. But the court did rely on risks of harms to third-party customers.

The district court thus held that Vyne Trellis potentially put data at risk of breach due to other malicious actors, but recognized at the same time that the data in question "does not belong to HSOne," rather to dentists and their patients. JA85. So this is a classic third-party injury that cannot ground an irreparable-harm finding. *See* JA1763 (justifying the injunction based on "the potentially catastrophic harms *to dental practices and patients* that would result from a data security breach").

The district court still allowed HSOne to rely upon that risk of harm to third parties on the basis that a possible security breach occurring on dentists' computers to dentists' data could cause HSOne reputational harm. JA85. That is completely speculative: For HSOne to suffer the injury, a security breach that neither party has ever experienced would have to occur; it would have to have been caused specifically by Vyne's integrations with Dentrix (and not any vulnerabilities in the dentist's computer or in HSOne's software); and then that breach would have to be blamed (wrongly, in HSOne's view) on HSOne, rather than on Vyne. This theory of irreparable harm to HSOne is far too speculative to pass the more-likely-than-not test the law requires. *Advanced Res. Int'l, Inc. v. Tri-Star Petroleum Co.*, 4 F.3d 327, 336 (4th Cir. 1993) (rejecting reputational-harm theory that was "too conjectural" because it was "dependent upon as-of-yet unproven fears" of a "series of events" that was "simply too speculative and abstract").

*Third*, the court's finding of harm due to an "increased risk" of a "data breach" to third parties (and thereby reputational harm to HSOne) was also insufficient because this Court's precedents require a movant to show that "violations made harm more likely than not," and instruct that

it is not enough to show that violations "only increased the risk of harm." *Rivers Coal.*, 178 F.4th at 118–19. Consistent with that standard, this Court has also rejected efforts to premise a preliminary injunction on vague security risks using "broad-strokes evidence" of "a risk to [computer] systems." *Real Time Med. Sys.*, 131 F.4th at 240; *accord Perplexity*, 184 F.4th at 1093 ("Amazon's cyber-risk harm argument is also weak.").

This Court's decision in *Rivers Coalition* is instructive. There, the district court issued an injunction in favor of an environmental group against a chemical company for discharging PFAS into the Ohio River, allegedly in violation of Clean Water Act permits. 178 F.4th at 110. This Court vacated the preliminary injunction because the district court had made "legal errors in its irreparable harm analysis." *Id.* at 114.

To begin, just as in this case, the district court had wrongly considered "irreparable harm to" third parties—*i.e.*, "the public"—but "public harm is a separate *Winter* factor, so considering public harm in the irreparable-harm inquiry would double-count it." *Id.* Moreover, just as in this case, there was no evidence that irreparable harm was "more likely than not." *Id.* at 118–19. As this Court explained, "the district court

relied on [expert] testimony that the permit violations only increased the *risk* of harm, not that the violations *made harm more likely than not*." *Id.* That justified setting the injunction aside "even under clear error review," because *Winter* requires that "the irreparable harm must be 'likely,' not merely possible," and "[l]ikely means more likely than not." *Id.* at 117. The finding that the challenged conduct "only increases the risk of harm by some uncertain amount" is not enough. *Id.*

The district court's decision here reflects the same errors. It not only wrongly relied on the risk of security issues to third parties (customers), but it also, consistent with HSOne's witnesses' testimony, found only a "substantial risk" of a data breach. JA84–JA85. It therefore held that there was irreparable harm to HSOne despite never finding that a security issue to dentists, let alone any harm to HSOne, was "more likely than not" absent an injunction, as *Rivers Coalition* requires. 178 F.4th at 117. Indeed, the district court could not make that finding based on evidence in the record, given that Vyne Trellis has operated in essentially the same manner since at least 2021, JA958 (Nix), and "[t]here [being] no evidence that Vyne suffered or caused any data

security breach during the relevant period," or of HSOne being "aware of any such breach." JA75.

**B. The Equities Strongly Favored Vyne.**

The court below also committed legal error in weighing the equities.

**a.** The district court effectively ignored the harms that an injunction against Vyne would impose upon it, particularly in relation to the speculative risks to HSOne that the injunction was supposedly meant to address. Although the injunction is meant to address a speculative increased risk of security issues to dentists' data on their own computers, the district court acknowledged that, by design, the injunction "will restrict the manner in which Vyne provides certain patient engagement services to its customers and prevent it from providing these services," which may "harm . . . Vyne's legitimate business." JA91. Indeed, restricting Vyne's business is the focus of the injunction. JA91; JA1763. And it will thus impose irreparable harm to Vyne. *Cf. Real Time*, 131 F.4th at 239 ("erosion of [a company's] customer base" is irreparable).

The district court brushed that erosion aside on the basis that "these services are only utilized by a small minority of the customers it shares with HSOne." JA91. That is no basis to find harm not substantial

or not irreparable, particularly as the evidence that the district court cited placed the number at roughly 20%, which is certainly substantial. *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 274, 278 n.7 (4th Cir. 2025) (acknowledging harm from loss of 30% of customers).

Moreover, the injunction alters the status quo that existed between the parties for years, JA958 (Nix), because it orders Vyne to stop "market[ing], sell[ing], or distribut[ing] software" that Vyne has been selling since 2021. JA89–90. Thus, this injunction must satisfy the heightened standard that applies to mandatory injunctions given it upsets the status quo, *Real Time*, 131 F.4th at 223, though it cannot even satisfy the "steep" ordinary standard, *id.* Indeed, HSOne did not object to Vyne's use of this software until spring 2025—the same time it suddenly launched its campaign of misrepresentations and software blocking against Vyne that the court found likely unlawful. JA90; *see also* JA73–JA76 (describing HSOne's targeting of Vyne customers "through deceptive and otherwise unfair means").

The district court should not have so lightly discounted the harms an injunction will impose on Vyne, particularly in the context of the year-long history of these software functions being deployed without incident

or objection, punctuated only by HSOne's decision to engage in a tortious marketing campaign. *See MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339–40 & n.3 (4th Cir. 2001) (noting that a party opposing an injunction has "demonstrated that it will suffer more from a grant of an injunction than [the proponent] will from its denial" when it will suffer a loss of "its reputation and good will within the industry").

**b.** The district court also erred when considering the public interest, holding that the public interest supports an injunction when the district court's factual findings showed the opposite. As noted, the district court recognized that the dentists, not HSOne, owned the data whose security was supposedly at issue here. JA85. The court acknowledged that the dentists who used the VyneSync function voluntarily contracted with Vyne to use Vyne Trellis software with their data on their computers. JA79. And it found that the "availability of [patient and practice] data to the dental practices that need it" was "a matter of significant public interest that finds protection in public policy." JA87. The public interest should therefore have weighed against the injunction, not for it.

The public interest plainly respects practices' access to their own data as well as their choices about which software they wish to use on

their own computers to access that data and interact with patients. *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993) (affirming denial of injunction that would have "depriv[ed] consumers of a choice of products"). That is particularly so when (1) one party seeks a preliminary injunction that would suddenly bar the sale of software with functions available to dentists without incident for five years, and (2) the injunction will substantially disrupt dentists' workflows.

## CONCLUSION

This Court should not split with the Ninth Circuit's decision in *Perplexity*. It should vacate the district court's injunction against Vyne.

Dated: October 13, 2026

Respectfully submitted:

*/s/ Vincent Levy*
Vincent Levy
*Counsel of Record*
Jack L. Millman
Daniel Fahrenthold
Jessica Marder-Spiro
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Ave, 14th Floor
New York, New York 10017
vlevy@hsgllp.com

K. Nichole Nesbitt
Derek M. Stikeleather
GOODELL DEVRIES LEECH & DANN, LLP
One South Street, 20th Floor
Baltimore, MD 21202
dstikeleather@gdldlaw.com
knn@gdldlaw.com

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32

I hereby certify that the preceding brief complies with the type-volume limitation of the Rules, containing 11,562 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365, in 14-point Century Schoolbook font.

*/s/ Vincent Levy*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 13, 2026, I caused this document to be filed through the ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Vincent Levy*